**MARK KESHISHIAN & SONS, INC., et al., Appellants,**

v.

**WASHINGTON SQUARE, INC., Appellee.**

**No. 79–395.**

District of Columbia Court of Appeals.

Argued Oct. 24, 1979.

Decided April 24, 1980.

---

Patrick M. Norton, Washington, D. C., with whom Peter J. Nickles, Washington, D. C., was on briefs, for appellants.

Richard T. Tomar, Washington, D. C., with whom Dimitri P. Mallios, Washington, D. C., was on brief, for appellee.

Before KELLY, GALLAGHER and PRYOR, Associate Judges.

KELLY, Associate Judge:

Appellants Mark Keshishian & Sons, Inc. (henceforth the Keshishians), the ex-owners

and lessors of a piece of property in Southeast Washington, appeal a jury verdict of $300,000 compensatory damages and $50,000 punitive damages in favor of appellee Washington Square, Inc. (henceforth Washington Square), the lessee, for breach of a right of first refusal to purchase the Keshishian's property that Washington Square claimed had been incorporated into the lease.

The Keshishians argue that the trial court's instructions to the jury on liability and damages constituted reversible error and that there was insufficient evidence of special aggravating circumstances to sustain the punitive damages award. We affirm.

In the spring of 1974, John Ford and Denny Yakis (the principals of Washington Square, Inc.) began negotiations to lease an unimproved warehouse occupying the central, corner, lot of three lots owned by the Keshishians in Southeast Washington.[1] On July 10, at the Keshishians' request, Washington Square, planning to convert the empty building into a restaurant and night club, submitted a proposed lease agreement. The draft included a clause guaranteeing Washington Square a first option to purchase the property in the event it was offered for sale (henceforth a "purchase option").

■ The Keshishians rejected Washington Square's draft and, claiming that they wanted their own lawyers to prepare it, presented a lease without a purchase option clause.[2] Yakis and Ford testified that they objected to this,[3] but signed because the Keshishians promised to give them a purchase option separately and said, "There is no sense in putting [the purchase option] into the lease. . . . All we have to do is give you [a] letter . . . telling you that we give you the right of first refusal. . . ." (Yakis' testimony). Yakis testified that he waited until the letter granting them a purchase option arrived, on August 1,[4] and then "started driving nails," spending the next fourteen months, "never less than fourteen hours a day, seven days a week,"[5] plus over $273,000, renovating the warehouse.[6]

1. The warehouse was apparently then being rented for eighty dollars a month.

2. The lease which was signed provided for renewals after two, three, five, and five year terms. The rent increments for each period were either $200 or a figure calculated proportionately to the rise in the consumer price index for the period, whichever was greater. Thus, the lease was, effectively, for fifteen years. The maximum monthly rental at the beginning was $800, and at the end of the lease, $1400, in fixed dollars. Clause 33 provided for termination on 180 days' notice of sale. (Although appellants argued that clause 33 was incompatible with the existence of a purchase option, it simply provided for the possibility that the lessees chose not to exercise their option and the property was sold to another.) There was no integration clause.

Ford testified that "[a]bsolutely no way would [he and Yakis] get involved with [the Keshishians' lease] and they came back with their suggestion that they would give us a cover letter giving us the first right of refusal to buy the building . . . and that is all we wanted." He explained that without the purchase option, "at any time they could . . . give us six months' notice [under clause 33] and kick us out . . . . Well, we were going in and investing our money and I had to put a second lien on my house. Denny had to put a

first and a second on his. We made two bank loans. . . . [We owed] a total amount of two hundred and seventy some thousand dollars and I am not going to sign a six month's lease after that."

3. Even the Keshishians' expert witness, Ulysses (Blackie) Augur, owner of Blackie's Steakhouses, banker, and restaurant developer, conceded that he would never enter into a long term lease arrangement and invest a large amount of money developing a restaurant with no more protection against sudden termination than the 180 days' notice provided in clause 33.

4. Louis Guglielmo, a real estate investor, testified that he saw and read both the lease and the letter and was positive that the letter contained a purchase option.

5. Appellants' counsel repeatedly attempted to shake Yakis' testimony as to the number of hours he spent working on the renovations, without success.

6. Warren K. Shepherd, a retired D.C. Fire Inspector, testified that when he first saw the building "it was nothing but a shell and looked just like a rat trap" and when it was finished, he could not believe the transformation: "I could not imagine how they could do a building

During the period of construction, according to Yakis and Ford, they lent their only copy of the lease and purchase option letter to the Keshishians, who claimed their attorney had lost his copy. When it was returned, they noticed that the original purchase option was gone, and a xeroxed paper was substituted. They attempted, but were unable, to get the original letter back, but apparently did not notice that the terms of the substituted cover letter were different.[7]

On September 20, 1975, the restaurant opened, apparently with great success. A few months later, Donald Culver, president of the 1776 Company (which owned three competing restaurants in the area), offered to purchase Washington Square's lease. Washington Square refused his offer.

In early 1976, Solomon Alex Stern, an experienced local restaurant broker, relayed a $400,000 offer from his customer, Ernie Green, to Washington Square. Stern testified that he considered $400,000 a fair price for the restaurant[8] because it had "a fantastic lease, terrific lease;" "the rent was very—was more than reasonable rent;" "the business was very good;" and the improvements "cost almost three hundred thousand dollars and [the restaurant] was built from scratch."

On March 1, 1976, the Keshishians sold the lot Washington Square was leasing and the two adjoining lots to the 1776 Company. On May 12, they offered to renege on their deal with 1776 if Washington Square agreed to buy all three lots. Unable to afford more than the restaurant property, Washington Square refused.[9]

The 1776 Company negotiated a new lease, at a greatly increased rental—$20,000 a year, more than twice the prior cost—and, when Washington Square fell behind in payments, gave them notice to quit under clause 33. *See supra* note 2. After suing for possession, 1776 succeeded in evicting Washington Square,[10] which then brought this action for breach of contract against the Keshishians.[11]

Most of the appellants' arguments for reversal stem from the trial court's allegedly erroneous instructions, or from its failure or refusal to submit certain instructions to the jury. We consider only those errors that were properly raised at trial, via specific objections, made prior to the jury's retirement, stating distinctly the grounds for objection. Super.Ct.Civ.R. 51. Those errors raised for the first time on appeal are not grounds for reversal unless "it is apparent from the face of the record that a 'miscarriage of justice' has occurred."

like that with the small crew that they had. So I took a number of friends out there to see what type of building it was and it was a beautiful building."

Yakis said: "I renovated everything from the front door to the back door including the sidewalk, the side parking lot, and I built—I put the walk in, the plumbing in, the electrical in and I completely put everything in that shell . . and I exceeded the specifications of the District of Columbia." We note that, contrary to appellants' contention, an owner's oral estimate of the worth of his property is admissible to show the value of the business. *Helphenstine v. Downey,* 7 App.D.C. 343 (1895).

7. The second letter was introduced into evidence. It granted Washington Square the first option of continuing its lease in the event the Keshishians transferred record title among themselves ("lease option"). Only the existence of the lease option is relevant (to the question of Washington Square's credibility) since its terms are not inconsistent with either the lease agreement or the purchase option. It

was signed only by the Keshishians and not notarized.

8. The value of the restaurant included the lease, the improvements, and the worth of the business as a going concern.

9. Appellants' argument that their offer—to sell Washington Square three lots instead of one, made *after* 1776 had obtained equitable title—constituted substantial compliance with the terms of the purchase option is wholly without merit.

10. Evidence regarding the judgment of eviction in the Landlord Tenant Branch of the Superior Court was properly excluded by the trial court as devoid of collateral estoppel effect in this action.

11. There was evidence that, after Washington Square vacated the premises and removed their equipment, the restaurant was vandalized and the equipment was stolen from storage.

*Weisman v. Middleton*, D.C.App., 390 A.2d 996, 1000 (1978) (citations omitted).[12]

### I

Although appellants argue that the trial court should have instructed the jury to disregard the purchase option unless "clear and convincing" evidence both of its contents and of its existence was presented, to overcome the presumptions of both the parol evidence rule and the Statute of Frauds, there was neither a proffer of, nor an objection to the absence of, such an instruction. Therefore, we can only review this alleged error if the *Weisman* exception is applicable.[13]

The parol evidence rule, contrary to appellants' implication, does not bar the introduction of parol evidence that a written agreement, such as the lease, was not intended to be a complete statement of the agreement between the parties at the time it was signed. "In this jurisdiction . . it is well settled that a written contract may be conditioned on an oral agreement that the contract shall not become binding until some condition precedent resting in parol [evidence] shall have been performed." *Luther Williams, Jr., Inc. v. Johnson*, D.C.App., 229 A.2d 163, 164 (1967) (citing *Burke v. Dulaney*, 153 U.S. 228, 14 S.Ct. 816, 38 L.Ed. 698 (1894) (parol evidence that parties did not intend home improvement contract to become binding until financing obtained is admissible "when the contract is silent on the matter, the testimony does not contradict nor is it inconsistent with the writing, and if under the circumstances it may properly be inferred that the parties did not intend the writing to be a complete statement of their transaction." *Id.* at 165 (citing *Seitz v. Brewers' Refrigerating Mach. Co.*, 141 U.S. 510, 12 S.Ct. 46, 35 L.Ed. 837 (1891)).[14]

The chief complication in this case is that a reality purchase option is unenforceable under the Statute of Frauds unless it has been reduced to writing and signed by the party being charged. D.C.Code 1973, § 28-3502. *See Feltman v. Sarbov*, D.C.App., 366 A.2d 137, 140 (1976); Restatement of Contracts § 216 (1932); 3 Williston on Contracts § 527 (1960). However, parol evidence is admissible to prove both the contents and the existence of a writing which satisfied the Statute of Frauds when executed, but was subsequently lost or destroyed.[15] *See* 2 Corbin on Contracts § 529 (1950). This parol evidence must also be clear and convincing.

Appellee was entitled to have its theory of the case submitted to the jury, even if it was not shared by appellants, as long as it was supported by the evidence. *Wingfield v. Peoples Drug Store, Inc.*, D.C.App., 379 A.2d 685, 688 (1977), *rehearing and rehearing en banc denied* (1978); *Metropolitan Life Ins. Co. v. Adams*, D.C.Mun.App., 37 A.2d 345, 350 (1944).

12. Although the record includes several references to three proposed instructions that the trial court agreed to make "a part of the file," they were not included in the record and are, therefore, necessarily ignored here.

13. The only objection to the trial court's instructions that was even arguably related to burdens of proof in parol evidence cases was: "I have an objection to the instruction that you can modify an agreement by a subsequent document such as the letter attached to the agreement because I don't think that is an accurate statement of the law. You would have to have consideration for any subsequent one." This objection is entirely inadequate to preserve the burden of proof issue on review, Super.Ct. Civ.R. 51, and betrays counsel's misunderstanding of appellee's theory of recovery, which was that the lease was never intended to be binding until the occurrence of a condition precedent—the Keshishians' grant of a purchase option. *See infra.* Since that was, analytically, part of the original lease, no further consideration was necessary.

14. And *see Gagnon v. Wright*, D.C.App., 200 A.2d 196, 198 (1964) (citing *Binder v. Benson*, 225 Md. 456, 171 A.2d 248 (1961) (allowing an exception to the parol evidence rule "if the other party knew, or should have known, that [the apparent acceptor] did not intend to be bound by the terms of the writing").

15. It is first necessary to give a satisfactory explanation for the failure to produce a writing. *See Alvin Epstein Advertising v. Helfer*, D.C.App., 138 A.2d 925, 927 (1958). We cannot say that appellee's evidence regarding the loss of appellee's purchase option was inadequate to explain its absence, particularly when its sufficiency was never questioned at trial.

There was no contention at trial that the purchase option was oral.[16]  Washington Square consistently claimed that the option was reduced to writing, and then lost or destroyed by the Keshishians.  Nor was there any question, once there was a finding that it was reduced to writing, that the purchase option could be read into the lease contract: "[T]he nearly universal rule is that a complete contract binding under the Statute of Frauds may be gathered from letters, writings and telegrams between the parties relating to the subject matter of the contract when [they are] so connected with each other that they may be fairly said to constitute one paper  . . . ." *Ochs v. Weil*, 79 U.S.App.D.C. 84, 86, 142 F.2d 758, 760 (1944).

We cannot conclude on this record that the trial court's unobjected to failure to give a "clear and convincing" evidence instruction amounts to such a "miscarriage of justice" that it warrants reversal of the jury's finding.  Even if an instruction is requested, "the refusal to grant [it] is not grounds for reversal when the charge as given, although in a more general form, fully informs the jury as to the law." *Wingfield v. Peoples Drug Store, Inc.*, D.C. App., 379 A.2d 685, 689 (1977) (quoting *Evans v. Capital Transit Co.*, D.C.Mun.App., 39 A.2d 869, 871 (1944)).  Since there was ample evidence to submit the questions of the purchase option's existence and contents to the jury, and there was neither a specific objection nor an alternate proffer by appellants, the jury's finding of liability must stand undisturbed.

## II

Appellants also object to the trial court's instructions on the measure of compensatory damages, claiming that the standard of recovery for breach of the realty purchase option is not the fair market value of the entire lease but, rather, the difference between the price set in the option and the actual sales price.  This would be the correct standard were this action merely for breach of an independent, discrete, separately bargained for, purchase option.  It is not.  The Keshishians' breach of the option resulted in breach of the entire lease, of which the purchase option was an inseparable and indispensable part.  Therefore, compensatory damages may be measured, as the trial court did here, by the fair market value of the plaintiff's interest in the leased premises, including the value of the lease, which the trial court properly defined as "the price in cash or its equivalent that the property would have brought considering its highest and most profitable use if offered for sale on the open market. .  ."

The court's instruction on damages comports with the characterization of a leasehold as an estate in lands, *see Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.*, 168 U.S.App.D.C. 149, 161–62 n.92, 513 F.2d 407, 419–20 n.92 (1975), and with the standard we recently enunciated in *Wentworth v. Airline Pilots Ass'n*, D.C.App., 336 A.2d 542, 543 n.1 (1975) (quoting *In re Lehigh & Wilkes-Barre Coal Co.'s Assessment*, 298 Pa. 294, 300, 148 A. 301, 303 (1929)): "Ordinarily, by 'fair market value' is meant the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied."

The proper measure of compensatory damages for breach of contract was stated recently in *Sears, Roebuck & Co. v. Goudie*, D.C.App., 290 A.2d 826, 832, *cert. denied*, 409 U.S. 1049, 93 S.Ct. 523, 34 L.Ed.2d 501 (1972) (*as amended on denial of rehearing en banc*): "[Those] as may fairly and reasonably be considered either arising

16. The fact that the trial court's instruction regarding the requirements for finding a binding contract—that the terms and the parties' obligations under it be "clear, definite and certain, and not vague, indefinite or uncertain"— was an adaptation of Standardized Jury Instructions for the District of Columbia, No. 310 (1968), regarding *oral* contracts, is irrelevant, appellants' contrary assertion notwithstanding. The instruction that was given was a correct and adequate statement of the law regarding written contracts as well and was carefully adapted to the facts of this case. (The word "oral" never appeared.)

naturally, *i. e.*, according to the usual course of things from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it." (Quoting *Fowler v. A & A Co.*, D.C.App., 262 A.2d 344, 349 (1970)) (citing *Hadley v. Baxendale*, 9 Exch. 341 (1854)). The recovery "may also extend to loss of business income or profits suffered through collateral contracts or from collateral sources if such damages were otherwise foreseeable and proved with certainty." *Sears, Roebuck & Co. v. Goudie, supra*, 290 A.2d at 832 (citing 22 Am.Jur.2d *Damages* §§ 61–62 (1965)). "[M]athemetical precision" is not necessary, *id.* 290 A.2d at 833; *Spar v. Obwoya*, D.C.App., 369 A.2d 173, 180 (1977), and lost goodwill may also be included as damages.[17]

■■■■■ Given the substantial, uncontradicted, evidence that Washington Square received an offer of $400,000 for its leasehold interest and that it invested close to $300,000 in refurbishing its property,[18] we cannot conclude that a verdict of $300,000 indicates "prejudice, passion or partiality, or [that] . . . it must have been based on oversight, mistake or consideration of an improper element." *Spar v. Obwoya, supra* at 180 (citing *Lester v. Dunn*, 154 U.S.App. D.C. 399, 402, 475 F.2d 983, 986 (1973)).[19]

### III

■■ Appellants properly preserved their objections to the trial court's instructions on punitive damages. They objected on the grounds that (1) punitive damages are not recoverable for breach of contract actions; (2) they were not supported by sufficient evidence; and (3) they were not properly pleaded in this case.[20]

■■ Although punitive damage awards for breach of contract are rare, they may be recovered in this jurisdiction. *Harris v. Wagshal*, D.C.App., 343 A.2d 283 (1975) (punitive damages upheld when appellants purposefully concealed the existence of an option from the court with intent to defraud appellee); *Den v. Den*, D.C.App., 222 A.2d 647, 648 (1966) (punitive damages recoverable when the "acts of the breaching party are malicious, wanton, oppressive or with criminal indifference to civil obligations . . . [and] merge with and assume the character of a willful tort") (citing *Brown v. Coates*, 102 U.S.App.D.C. 300, 303, 253 F.2d 36, 39, 67 A.L.R.2d 943 (1958)).

■■ The evidence sufficient to support an award of punitive damages includes proof of fraud or deceit since fraud necessarily encompasses malice. *District Motor Co. v. Rodill*, D.C.Mun.App., 88 A.2d 489, 492–93 (1952) (cited in *Harris v. Wagshal, supra* at 288).

■■ The determination of whether there is a sufficient legal foundation for the

---

**17.** In *Sears, Roebuck & Co. v. Goudie, supra*, lost business damages were foreseeable since the lessor (Sears) knew that lessee was conducting a business (a coffee house) for profit and the lessee's plans for remodeling were made available to it.

**18.** Since appellants did not object to the introduction of evidence at trial regarding the $400,000 purchase offer or the appellee's $275,000 estimate of the value of renovating the premises, we cannot address its argument on appeal that the evidence was so unreliable as to require a new trial on the issue of damages. *See supra* note 6. Appellants had the opportunity at trial to impeach the witnesses and to offer their own expert's evaluation of the property. The fact that "no documents were introduced to support" the appellee's evaluations does not nullify their evidentiary worth. Once the evidence regarding valuation was admitted, with-

out objection, the only issue was credibility, which is reserved for the jury's determination.

**19.** The burden of showing mitigation of damages is on the party raising the issue. *See Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc., supra* at 161–62 n.92, 513 F.2d at 419–20 n.92. Thus, it was up to appellants to establish the salvage value of the property appellee removed from the restaurant. Appellants also failed to request an instruction on this issue.

**20.** The latter contention is clearly incorrect: Appellee's complaint demanded judgment "in the sum of $300,000 compensatory damages and $250,000 exemplary damages and costs;" the terms "punitive" and "exemplary" are synonymous.

award of punitive damages lies with the trial court. *See Harris v. Wagshal, supra,* at 288 n.13 (citing *United Securities Corp. v. Franklin,* D.C.Mun.App., 180 A.2d 505, 511 (1962)).

■ We cannot say that the evidence here—that appellants requested appellee to entrust them with its only copy of the purchase option under false pretenses and then destroyed it; and that they later sold appellee's restaurant, in which they knew a huge amount of time and work had been invested, to appellee's known competitor—may not support a finding of fraud or deceit as a matter of law. If appellee's evidence is believed, appellants effectively attempted to use the Statute of Frauds as an instrument of fraud by procuring, under false pretenses, appellee's written purchase option; *cf. Kresge v. Crowley,* 47 App.D.C. 13, 16 (1917) (citing *Purcell v. Miner (Purcell v. Coleman),* (4 Wall.) 513, 517, 18 L.Ed. 435 (1867)) (lessee, relying upon oral lease, expended large sums of money improving premises, and bought a barroom license; lessor sold the premises to another who had notice of the lease agreement but attempted to evict tenant; held that equity may step in and enforce the agreement, even against the purchaser, to keep "the statute made to prevent frauds from becoming the instrument of fraud.")

### IV

■ Appellants' final contention is that it was prejudicial error not to give an adverse inference instruction regarding Washington Square's failure to produce highly relevant records. They claim that the trial court's instruction to "view with caution the weaker and less satisfactory evidence actually offered on [a] point unless the failure to produce . . . stronger and more satisfactory evidence had been satisfactorily explained" was fatally inadequate.

Their record objection, however, did not state any grounds for giving an adverse inference instruction; the objection was stated to be "because I think that that [instruction] is similar to the missing witness instruction." This articulation of appellants' objection is unintelligible and, therefore, is not preserved on appeal.[21]

*Affirmed.*

PRYOR, Associate Judge, concurring:

I concur in the affirmance of the judgment for appellee.

I have some concern with respect to the measure of damages. The jury found appellee was a leaseholder whose right of first refusal to purchase was breached. The instruction given, and approved here, is that damages should be measured by "the fair market value of the property at the time of the loss." Thus the jury was asked to measure the leasehold interest as a property right.

Under the circumstances of this case, there being no alternative instruction offered by counsel for appellants at trial, we have found no error.

I would note that this may not be the only way to measure the harm. It is conceivable, to me at least, that the jury could be instructed that where a right of first refusal to purchase is denied, the holder of the right may recover reasonable compensation for injuries which are shown to be the foreseeable result of the breach. *See Schoonover v. Kahn,* 377 S.W.2d 535, 539 (Mo.App.1965). Restatement of Contracts § 330 (1932).

---

21. *See Franklin Investment Co. v. American Mutual Insurance Co. of Boston,* D.C.App., 256 A.2d 620 (1969), where the court held that a party cannot ask for an instruction on an opponent's failure to produce a document unless he has first made diligent efforts to secure it. Appellants "could have availed [themselves] of . . . discovery . . . and obtained [the document] but made no apparent effort to do so." *Id.* at 622.