**PSYCHIATRIC INSTITUTE OF WASHINGTON, Appellant,**

v.

**James T. ALLEN and Bonita K. Allen, Appellees.**

No. 84–114.

District of Columbia Court of Appeals.
Argued Nov. 28, 1984.
Decided May 20, 1986.

David P. Durbin, with whom Edward J. Lopata, Washington, D.C., was on brief, for appellant.

W. David Allen, with whom Allen T. Eaton and Richard L. Swick, Washington, D.C., were on brief, for appellees.

Before MACK, BELSON and TERRY, Associate Judges.

TERRY, Associate Judge:

On August 12, 1981, thirteen-year-old Daniel Allen was admitted to the Psychiatric Institute of Washington ("the Institute"), a private psychiatric hospital. One month later, on September 12, an Institute employee walked into Daniel's room and found him lying on the floor unconscious, with a belt around his neck. Efforts to revive him were unavailing. He was taken to Georgetown University Hospital, where he died without regaining consciousness.

Daniel's parents, James and Bonita Allen, brought this action against the Institute and Dr. Judith Forgotson, the psychiatrist in charge of Daniel's treatment there, alleging that his death was a direct and proximate result of their negligence. The jury returned a verdict in favor of Dr. Forgotson, but it found the Institute liable to the Allens and to Daniel's estate in the amount of $270,000. On appeal from the judgment entered on that verdict, the Institute contends that there was insufficient evidence to permit the case to go to the jury, that the court erred in refusing to give certain jury instructions, and that counsel for the Allens made improper comments during his closing argument which deprived the Institute of a fair trial. We find no reversible error and accordingly affirm the judgment.

## I

The evidence at trial established that Daniel Allen had a history of serious psychiatric problems. When, at the age of twelve, he was involved in several fire-setting episodes, his parents sought profes-

sional assistance from Dr. Myron Hafetz, a clinical psychologist. After treating Daniel for approximately three months, Dr. Hafetz concluded that he might "hurt himself or be a danger to the community."[1] Dr. Hafetz therefore referred him to Children's Hospital, where he was treated on an emergency basis for approximately six weeks. At the time of his admission, the following entry was made in Daniel's file:

Child requires emergency hospitalization for escalating firesetting, potentially life-threatening....

\* \* \* \* \* \*

*Diagnostic impression* —severe neurotic character, narcissistic personality; no evidence on initial exam of borderline pathology.

His admission note stated:

Daniel is a 12 [year] old [white] male referred by private [doctor because of a history] of firesetting.... [History] of setting fire to his bed and then climbing into bed to sleep—seemingly unaware of suicidal gesture.

Within a few days after his admission to Children's Hospital, a staff psychiatrist, Dr. Taiw Okusami, and several of his colleagues devised a comprehensive treatment plan for Daniel. This treatment plan, which became a part of Daniel's file, was in the form of a table. Under the heading "Problem Description" appeared the entry "Suicidal Ideation." In the next column, under the heading "Plan," was written the following:

Observe on ward. Limit to ward. Review next Wednesday. Explore ideation in extended psychiatric and psychological evaluation.

In the next column immediately to the right, under the heading "Goals," was written "Prevent Suicide." The fourth column listed the names of the hospital staff members responsible for Daniel's care. Finally, in the fifth column, headed "Current Status of Problem," appeared this entry:

Passive suicidal ideations and frequent talk about death; sometimes wishing [he] were dead.

About three weeks later, a nurse found Daniel in a compromising sexual situation with another patient. While the nurse and Daniel were discussing the incident, Daniel "expressed wishes that he were dead"; he was then placed on a twenty-four-hour suicide watch. Some time thereafter Dr. Okusami concluded that Daniel needed extended treatment in a residential program and referred him to the Institute.

Daniel was admitted to the Institute on June 23, 1980. Records prepared at that time said that he was being admitted because:

1. Suicidal or destructive behavior [was] an immediate threat.

2. Magnitude of deviant behavior [was] no longer tolerable to patient or society.

3. Treatment [could not] be initiated or continued unless in a supervised setting.

4. Previous hospitalization [had] not used approach available here.

5. Ambulatory treatment [had] been unsuccessful in halting or reversing the course of mental illness.

The Institute gave Daniel a series of tests which revealed that he had a "serious emotional disturbance characterized both by an unsocialized aggressive reaction with firesetting behavior as well as a depressive reaction with poor self-esteem and self-destructive impulses." The tests also established that "[s]uicidal ideation [was] indicated yet intellectually defended against."

Daniel attended special education classes and participated in individual, group, and family therapy sessions on a regular basis. Despite the therapy, Daniel continued to place himself in dangerous situations and suffered a series of injuries. In August the following notations were made in his file:

---

1. Dr. Hafetz's conclusion was based, in part, on the results of certain diagnostic tests which revealed that Daniel had "suicidal ideations" and "self-destructive tendencies."

*Family Problems:* There [is] some difficulty with the family's understanding of Daniel's accident-proneness. There is a tendency for them to underestimate the constant danger and self-destructive trends that Daniel engages in....

\*    \*    \*    \*    \*    \*

*Somatic Complaints:* Daniel continues to use his real medical problems in addition to other complaints about his body in an effort to gain attention. Since he has been on the program to avoid self-destructive activity, he has put himself in a number of dangerous positions.

\*    \*    \*    \*    \*    \*

*Accident Prone Behavior:* This problem was added today with the recognition of the fact that he has not had any day while on the program in which he was able to take care of himself without putting himself in a dangerous position. This whole area needs to be further explored with the parents to see how they set limits on his potentially dangerous activities.

\*    \*    \*    \*    \*    \*

In regard to Daniel's need for hospitalization, it is apparent that his self-destructive activity, which prior to admission was manifest in fire-setting and other more acting out behavior, has now been turned more upon his own body. He has had a series of injuries often sustained when he has put himself into dangerous positions.

Daniel remained at the Institute until October 1980, when he was discharged for eye surgery at Walter Reed Army Hospital.[2] At the time of his discharge, his doctor, Dr. Judith Forgotson, noted in Daniel's file that he had shown some improvement in certain areas but nevertheless "required further extended psychiatric treatment."

After the surgery, Daniel went home to recuperate. When he returned to the Institute on August 12, 1981, he was diagnosed as suffering from a "socialized aggressive conduct disorder," and Dr. Forgotson was again assigned to treat him. On the day of his admission, a preliminary treatment plan was devised which included "monitoring of sexual, anti-social, aggressive, [and] self-destructive behavior."[3]

During the weeks that followed, Daniel was hostile and uncommunicative and had difficulty adjusting to the hospital regimen. On September 10 he became involved in an argument with one of his peers in a group therapy session. He burst into tears and on his way out of the room hit a wall with his right hand. The next evening, September 11, staff members heard Daniel "thumping his right hand on the wall several times." When they walked into his room, they discovered that he had removed the putty from the safety windows. He was promptly moved to a three-bed room across the hall.

On the morning of September 12 Daniel was acting in an "angry and defiant manner." He maintained a "blank expression on his face" at a community meeting, refused to interact with his peers, and announced that he was going to try to get as many "infractions" as he could. Later in the day, on being reprimanded for failing to wait in line for his lunch, he left the cafeteria without eating. Shortly thereafter he approached the nurses' station and asked two of the nurses, Barbara Pickett and Laura Maze, if "it hurt to starve yourself." One of the nurses thought the question was asked in a "joking manner," and replied "Yes, it does; it wouldn't be a good idea." Daniel lingered at the nurses' station for a few minutes, then walked down the hall toward his room. Approximately five minutes later, a psychiatric technician

---

2. The surgery was unrelated to his psychiatric illness; he had suffered an injury to his eye several years earlier.

3. Curiously, at the time of Daniel's readmission, a staff member filled out a form captioned "Likelihood of Serious Harm" by checking a box indicating that Daniel did not have a "history of attempted suicide or self-destructive behavior."

walked into his room and found him unconscious on the floor with a belt around his neck. He was immediately transported to Georgetown University Hospital, but he never regained consciousness and died a short time later.

## II

At trial the Allens introduced evidence that the Institute had failed to obtain Daniel's records from Children's Hospital—records which revealed (1) that Daniel had been hospitalized because of "escalating firesetting [which was] potentially life-threatening," (2) that Daniel had climbed into his bed after setting fire to it, (3) that Daniel had "passive suicidal ideations" and frequently spoke about death, and (4) that one of the goals of the hospital's treatment program was to "prevent suicide." The Allens also established that the nurses on duty at the time of Daniel's death had not read the records from Children's Hospital, that they had not considered Daniel to be suicidal, and that they had not read the Institute's records relating to his previous admission and treatment at the Institute—records which revealed (1) that suicidal or destructive behavior was "an immediate threat," (2) that Daniel was accident-prone and "self-destructive," and (3) that his self-destructive activity, which before his admission "was manifest in fire-setting and other more acting out behavior, [had] now been turned more upon his own body." [4]

Dr. Alan Zients testified for the Allens as an expert witness. Dr. Zients, a psychiatrist, expressed the opinion that the care and treatment which the Institute had provided to Daniel did not meet the standard of care required of an in-patient psychiatric facility in the District of Columbia. The doctor's opinion was based, in part, upon the fact that the Institute had failed to

obtain Daniel's medical records from Children's Hospital and failed to inform its staff fully of Daniel's psychiatric history. He said that it was the "responsibility of a psychiatric hospital and the staff of that hospital ... to be fully informed of all relevant history, to be aware of what needs to be communicated to [the] staff and to see that [the] staff is cognizant, is knowledgeable about the pertinent history." Dr. Zients also concluded that the staff had failed to take appropriate measures to safeguard Daniel from self-destructive activity. More specifically, he stated, the staff should have taken more seriously Daniel's question as to whether "it hurt to starve yourself," should have made some effort to counsel him, and should have placed him on suicide precautions. Finally, Dr. Zients said that it was his opinion, based on a reasonable degree of medical certainty, that the acts and omissions of the Institute caused or contributed to Daniel's death. He testified that "if the staff had been aware of the problems and if they had responded appropriately ... there is an excellent chance that Daniel ... would not have died." [5]

The jury found that Daniel's death was "the proximate result of negligence on the part of the employees or the staff of the [Institute]" and awarded $270,000 in damages to the Allens and to Daniel's estate. After its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial or remittitur was denied, the Institute noted this appeal.

## III

In a medical malpractice case the plaintiff must prove, generally through expert testimony, that there was an applicable standard of care, that the defendant breached that standard, and that the

---

**4.** Although one of the nurses testified that she had read these records, she was not sure whether she had read them before or after Daniel's death.

**5.** On cross-examination Dr. Zients testified that, while the staff could not have predicted that

Daniel was going to commit suicide, there were "[m]any warnings which should have been heeded which would have led to any of a number of measures which might have saved his life."

breach was a proximate cause of the plaintiff's injuries. *See, e.g., Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984); *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979); *Haven v. Randolph,* 161 U.S.App.D.C. 150, 151, 494 F.2d 1069, 1070 (1974).[6] To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries *and* that the injuries were foreseeable. *See, e.g., District of Columbia v. Freeman,* 477 A.2d 713, 716 (D.C.1984); *Lacy v. District of Columbia,* 424 A.2d 317, 320 (D.C.1980).

■ To meet their burden of proof, the Allens relied on the expert testimony of Dr. Zients. The doctor testified that it was his opinion, based on a reasonable degree of medical certainty, that the care and treatment which the Institute provided to Daniel did not meet the applicable standard of care, and that the Institute's breach of that standard caused or contributed to Daniel's death. Dr. Zients carefully explained to the jury the factual basis of his opinion. The Institute, however, focuses on the doctor's statement that if the staff had been aware of Daniel's problems and responded appropriately, there was "an excellent chance that Daniel ... would not have died." It argues that this and similar testimony reveals that Dr. Zients was not certain Daniel would have survived even if there had been no breach of the standard of care. Therefore, the Institute maintains, the doctor's opinion that there was a causal relationship between the Institute's negligence and Daniel's death was legally insufficient because it was not based on a reasonable degree of medical certainty, but

only a "reasonable degree of medical probability." This argument is without merit.

Although "there may well be a sound basis for the requirement that expert medical testimony be given in terms of 'reasonable medical certainty,'" *Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366, 368 (D.C. 1980), the law does not require the expert to testify that he or she is personally certain that the plaintiff would not have sustained the injuries but for the defendant's negligence. "The fact of causation is incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise." W. PROSSER & W. KEETON, THE LAW OF TORTS § 41, at 269–270 (5th ed. 1984). The expert need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries. *See Fitzgerald v. Manning,* 679 F.2d 341, 351 (4th Cir.1982); W. PROSSER & W. KEETON, *supra* at 269. That was the essence of Dr. Zients' testimony in this case. Because he stated his opinion "to a reasonable degree of medical certainty"[7] and fully set before the jury the factual basis of that opinion, we hold that the doctor's testimony was sufficient to prove that the Institute's negligence was the proximate cause of Daniel's death.

■ The Institute also contends that the Allens failed to establish that Daniel's injuries were foreseeable. Although Dr. Zients acknowledged that the staff could not have predicted that Daniel was going to commit suicide, he also said that the staff should have known that Daniel needed to be watched closely for self-destructive activity and that there were "[m]any warnings

---

**6.** Not every case calls for expert testimony, however. *Compare Eibl v. Kogan,* 494 A.2d 640 (D.C.1985) (expert testimony required), *with Washington Hospital Center v. Martin,* 454 A.2d 306 (D.C.1982) (expert testimony not required).

**7.** Dr. Zients testified on direct examination:

Q. Now, Doctor, do you have an opinion to a reasonable degree of medical certainty as

to whether the foregoing acts and omissions that you have described of Psychiatric Institute caused or contributed to causing Daniel Allen's death?

A. Yes.

Q. What is your opinion?

A. I think it did.

which should have been heeded which would have led to any of a number of measures which might have saved his life." This testimony was sufficient to permit a reasonable juror to conclude that Daniel's injuries were foreseeable. "A defendant need not have foreseen the precise injury, nor 'should [he] have had notice of the particular method' in which a harm would occur, if the possibility of harm was clear to the ordinarily prudent eye." *Kendall v. Gore Properties, Inc.,* 98 U.S.App.D.C. 378, 387, 236 F.2d 673, 682 (1956) (footnotes omitted); *accord, Spar v. Obwoya,* 369 A.2d 173, 177 (D.C.1977).

■ Thus we hold that the Allens introduced sufficient evidence to meet their three-part burden of proof under *Meek v. Shepard, supra,* and the cases on which *Meek* was based. We also hold that the evidence was sufficient to prove that Daniel's death was a foreseeable result of the Institute's negligence. *See Kendall v. Gore Properties, Inc., supra.*[8]

## IV

■ The Institute also contends that the trial court erred in refusing to grant its request for two special instructions regarding the standard of care by which its actions, and those of its staff, were to be judged. We find no error.

A trial court has broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular

instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law. *E.g., Mark Keshishian & Sons, Inc. v. Washington Square, Inc.,* 414 A.2d 834, 841 (D.C.1980); *Wingfield v. Peoples Drug Store, Inc.,* 379 A.2d 685, 689 (D.C.1977); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2556, at 655–656 (1971). Although the court refused to give the two proposed instructions in the language requested, it granted the requests in substance.[9] It did instruct the jury that the Institute was required to use "reasonable care in safeguarding [Daniel Allen] from self-inflicted injuries and death," that "the psychiatric nurses [were] required to use that degree of care, skill and learning ordinarily possessed by and used by psychiatric nurses acting under the same or similar circumstances," and that whether these standards were met was to be determined "only from the opinions of the doctors who have testified as expert witnesses as to such standards." The court also told the jury:

> Now, the mere fact, ladies and gentlemen of the jury, that an injury and the death of Daniel happened in this case does not mean that any party to this action was negligent. On the contrary, the legal presumption is that reasonable care was exercised by both [defendants]. The burden of proof is upon the party charging negligence to overcome this presumption of due care by a preponder-

---

8. We reject the Institute's challenge to the sufficiency of the Allens' evidence on damages. The figures proffered by the Allens' expert regarding Daniel's lost earnings were based upon statistics concerning the average high school graduate and not upon statistics about persons, like Daniel, who had both physical and psychological difficulties. This disparity, however, was made known to the jury, so that the jury could take it into account in assessing damages. The Institute, moreover, had an opportunity to cross-examine the expert and to introduce its own evidence on Daniel's potential future earnings. In these circumstances, we hold that the evidence was competent and legally sufficient. *See District of Columbia v. Barriteau,* 399 A.2d 563, 569 (D.C.1979).

9. The second requested instruction, Proposed Special Jury Instruction No. 9, read in part:

> You are instructed that the law recognizes that the treatment of mental patients is not an exact science, and the kind of precision we might expect in sciences such as math or engineering is not possible in psychology and psychiatry. The law also recognizes that it is particularly difficult to accurately predict future behavior.

The court rejected this language as "argumentative." We need not decide whether such an instruction was appropriate in this case. We hold only that the failure to give it, in light of the instructions actually given, was not an abuse of discretion.

ance of the evidence and to prove that the negligence was the proximate cause of the accident, injury or death of ... Daniel. And the burden is upon the plaintiff, again, ladies and gentlemen, to prove by a preponderance of the evidence that ... either [defendant] was negligent and that such negligence was the proximate cause of the injury and death of Daniel as I have defined proximate cause to you. And if the plaintiffs in this case have not fulfilled their burden of establishing this by the preponderance of the evidence, then under those circumstances the defendants are entitled to your verdict.

These instructions adequately and fairly stated the standard by which the Institute's actions were to be judged. The court's failure to give the specific instructions requested by the Institute provides no basis for reversal.[10]

## V

Relying on *Norfolk & Western Ry. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), the Institute contends that the trial court erred in denying its request for an instruction that any damage award would not be subject to income taxation. This is an issue of first impression in the District of Columbia. We are persuaded by the Supreme Court's holding in *Liepelt*, and thus we hold that henceforth such an instruction should be given if requested. However, because we are satisfied in this case that the lack of an instruction resulted in no prejudice to the Institute, we also hold that the court's refusal to give it was not reversible error.

In *Liepelt* the administratrix of an estate brought suit under the Federal Employers' Liability Act (FELA) to recover damages on behalf of the decedent's survivors. At trial the administratrix introduced expert testimony that the survivors had suffered

damages in the amount of $302,000, while the defendant's expert testified to a much lower figure. The jury nevertheless returned a verdict of $775,000. The defendant appealed, contending *inter alia* that the court committed reversible error in denying its request for an instruction that any award would not be subject to income taxation. The Supreme Court agreed, holding that a defendant in a wrongful death action brought under the FELA was entitled, upon request, to such an instruction:

> [I]t is entirely possible that the members of the jury may assume that a plaintiff's recovery in a case of this kind will be subject to federal taxation, and that the award should be increased substantially in order to be sure that the injured party is fully compensated.

*Id.* at 496, 100 S.Ct. at 759; *see also Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284, 297 (9th Cir.1975); *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245, 1251 (3d Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971). The Court noted in *Liepelt* that the requested instruction was "brief[,] ... could be easily understood ... [and] would not be prejudicial to either party, but would merely eliminate an area of doubt or speculation that might have an improper impact on the computation of the amount of damages." 444 U.S. at 498, 100 S.Ct. at 759.

Because the *Liepelt* case arose under the FELA, the Supreme Court's opinion is not controlling in this case, an action brought under the District of Columbia wrongful death and survival statutes. *See, e.g., Hansen v. Johns-Manville Products Corp.*, 734 F.2d 1036, 1045 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985); *Vasina v. Grumman Corp.*, 644 F.2d 112, 118 (2d Cir.1981); *Croce v. Bromley Corp.*, 623 F.2d 1084, 1096–1097 (5th Cir.1980). This court has never been called upon to decide whether such an instruction should be given in any

---

10. We note, moreover, that the first requested instruction, Proposed Special Jury Instruction No. 2, relates solely to the standard of care required of a physician. Since the jury did not

find the physician in this case, Dr. Forgotson, negligent, the Institute could not possibly have been prejudiced by the court's failure to give this instruction.

case. A majority of the state courts that have addressed the issue have held that the instruction need not be given, *e.g., Marynik v. Burlington Northern, Inc.,* 317 N.W.2d 347, 351 (Minn.1982); *Barnette v. Doyle,* 622 P.2d 1349, 1367 (Wyo.1981), particularly when the court instructs the jury to confine itself to the evidence and not to award any damages that are speculative or remote. *See Henninger v. Southern Pacific Co.,* 250 Cal.App.2d 872, 879, 59 Cal. Rptr. 76, 81 (1967); Annot., 16 A.L.R. 4th 589 (1982). In fact, several courts have held that the instruction is not only unnecessary but improper. *See, e.g., Gorham v. Farmington Motor Inn, Inc.,* 159 Conn. 576, 579–80, 271 A.2d 94, 96–97 (1970); *Klawonn v. Mitchell,* 105 Ill.2d 450, 454, 86 Ill.Dec. 478, 480, 475 N.E.2d 857, 859 (1985); *Highshew v. Kushto,* 235 Ind. 505, 507, 134 N.E.2d 555, 556 (1956).

■ Nevertheless, we find the Court's opinion in *Liepelt* persuasive, and accordingly we hold that in any case in which trial begins on or after the date of this opinion, the trial court should, upon request, instruct the jury that any damage award will not be subject to income taxation. Such an instruction, as the Supreme Court said, will "eliminate an area of doubt or speculation that might have an improper impact on the computation of the amount of damages." 444 U.S. at 498, 100 S.Ct. at 759. In the case at bar, however, although the trial court did not give the instruction, there is nothing in the record to suggest that the jury inflated its award of damages in the erroneous belief that the award would be taxed. Moreover, the court gave the kind of instruction which has generally been deemed sufficient to dispel any likelihood of prejudice:

The amount of your verdicts must be based upon the evidence presented as to injuries and losses in this case. You are not to award ... speculative damages, that is, compensation for present or future detriment which, although possible, is remote or guesswork.

Absent evidence to the contrary, we must presume that the jury complied with this instruction. *E.g., Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). We therefore hold that the court's refusal to give the instruction requested by the Institute was not prejudicial and does not warrant reversal. *See Griffin v. General Motors Corp.,* 380 Mass. 362, 368–370, 403 N.E.2d 402, 407–408 (1980); *Bernier v. Boston Edison Co.,* 380 Mass. 372, 386–389, 403 N.E.2d 391, 400–401 (1980).[11]

## VI

■ Finally, the Institute maintains that counsel for the Allens made improper comments during his summation to the jury which deprived it of a fair trial. It contends that counsel expressed his own personal opinion concerning the veracity of the Institute's witnesses and that he wrongfully attributed improper motives to the Institute and its counsel. This is plainly the most troublesome issue in the case because such misconduct by an attorney can taint the fairness of the entire proceedings, even if the trial is otherwise error-free.

We readily agree that several of the comments made by the Allens' attorney during his closing argument were improper. For example, counsel said:

[Barbara Pickett] said she helped Daniel fix up his room, talked to him five minutes, calming him down, and she gave

---

11. We also reject the Institute's contention that it was entitled to an instruction on contributory negligence. When an injured party suffers from a mental infirmity, as in this case, the defendant is not entitled to such an instruction unless there is evidence that the injured party was capable of exercising reasonable care for his own safety and failed to do so. *See Mochen v. State,* 43 A.D.2d 484, 352 N.Y.S.2d 290 (1974).

*See generally Baltimore & Potomac R.R. v. Cumberland,* 176 U.S. 232, 20 S.Ct. 380, 44 L.Ed. 447 (1900). There was no evidence that Daniel Allen was capable of exercising reasonable care for his own safety; indeed, all the evidence suggested just the opposite. On this record we hold that the court properly declined to instruct the jury on contributory negligence.

him support before he left the nurses' station. Ladies and gentlemen, I think the evidence shows, and I think you will determine, that *this is an absolute utter fabrication.*

\* \* \* \* \* \*

What's even more incredible, Mr. Kearney came here and said Daniel had infractions and wasn't allowed in the day room. So how could he have gotten any milk during this period of time? He did not get it. And some of those experts ... said yes, anybody who drank milk therefore would not kill themselves. *That's not true and I think we all know that it's not true.*

\* \* \* \* \* \*

In addition to that, [Barbara Pickett] said Daniel got up [at] 8:00 o'clock in the morning and had his breakfast. The record shows he got up at 9:30 and ate sometime later. I think it's common knowledge when a person eats at 9:30 or 10:00 o'clock in the morning, it would still be in his stomach or a portion of it at 1:00 in the afternoon. He probably wouldn't have digested all the food and that milky substance. I submit to you, ladies and gentlemen, that *that too is a fabrication.*

\* \* \* \* \* \*

*Dr. Okusami ... came here and told you a number of things which were not true.*

\* \* \* \* \* \*

Ladies and Gentlemen, you heard Dr. Forgotson's testimony ... in which she said that [the] incident ... in which [Daniel] set a fire behind his bed, got in the bed, had nothing to do with any Nerf ball.... *That was another deliberate attempt to fool you.* See, the Nerf ball thing occurred in 1981 before the second hospitalization. It had nothing to do

with ... the hospitalization [at] Children's Hospital, but *that was a deliberate, prolonged attempt to deceive you. Why was such an attempt made? These are the questions that you're going to have to answer. Why would somebody try to perpetrate such a fraud on you ...?* [Emphasis added.]

We condemn these statements, and others like them, in the strongest possible terms; they simply should not have been made. An attorney must not accuse a witness of lying on the witness stand. This and other courts have repeatedly held that such comments are impermissible. *E.g., Miller v. United States,* 444 A.2d 13, 15–16 (D.C. 1982); *Dyson v. United States,* 418 A.2d 127, 130 (D.C.1980); *Olenin v. Curtin & Johnson, Inc.,* 137 U.S.App.D.C. 281, 424 F.2d 769 (1968), *cert. denied,* 394 U.S. 993, 89 S.Ct. 1485, 22 L.Ed.2d 769 (1969). In particular, the use of such words as "lie" and "fabrication" was expressly disapproved as far back as *Harris v. United States,* 131 U.S.App.D.C. 105, 402 F.2d 656 (1968).[12] Whether a witness is telling the truth is for the jury to decide; counsel's personal views on the matter are utterly irrelevant. *See McCowan v. United States,* 458 A.2d 1191, 1198 (D.C.1983).

The issue confronting us here, however, is whether counsel's statements were "likely to mislead, improperly influence, or prejudice the jury against the [Institute]," and, if so, whether "the court, by failing to apply appropriate disciplinary measures or to give suitable instructions, left the jurors with wrong or erroneous impressions, which were likely to mislead, improperly influence, or prejudice them to the disadvantage of the [Institute]." *Simpson v. Stein,* 52 App.D.C. 137, 139, 284 F. 731, 733 (1922); *accord, Ridilla v. Kerns,* 155 A.2d 517, 520 (D.C.1959); *Meyer v. Capital Transit Co.,* 32 A.2d 392, 394 (D.C.1943).

Although counsel's statements were certainly prejudicial, the court repeatedly in-

12. *Harris* is, of course, binding upon us under        *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971).

structed the jury that it was the sole and exclusive arbiter of the facts. After counsel's argument, moreover, the court told the jury:

I told you something else before closing arguments started. I reminded you that since you indeed are the sole and exclusive judges of the facts, that as you listen attentively to the arguments of ... counsel in closing arguments as they urge upon you what the evidence in this case proves or what it fails to prove, that if they recite the testimony of a witness differently than you remember it, then under those circumstances you are to rely on your own recollection regarding what the witness said and not what counsel said the witness said in the event your recollection differs with theirs. Because, again, the responsibility for deciding the facts in this case belongs to you and to nobody else.

We must presume that the jury followed these instructions. *Smith v. United States, supra.* We must also consider that the trial court, in denying the Institute's motion for new trial, determined that a new trial was not justified on this ground. On this issue the trial court's assessment is entitled to substantial deference.[13] Finally, we are satisfied that counsel's improper comments had no real effect on the jury because the party to whom they were most prejudicial, Dr. Forgotson, received a favorable verdict. Thus we conclude that counsel's statements, though flagrantly unprofessional, did not leave the jurors "with wrong or erroneous impressions, which were likely to mislead, improperly influence, or prejudice them to the disadvantage of the [Institute]." *Simpson v. Stein, supra,* 52 App.D.C. at 139, 284 F. at 733.

The judgment is therefore

*Affirmed.*

13. "A trial judge who has heard comments of counsel and observed the jury at the time thereof is, from the practical standpoint, in a much better position than the appellate court to judge

of their effect." *Washington Times Co. v. Bonner,* 66 App.D.C. 280, 292, 86 F.2d 836, 848 (1936); *accord, Meyer v. Capital Transit Co., supra,* 32 A.2d at 394.