Steven H. ROBINSON, Personal Representative of the Estate of James M. Robinson, et al., Appellants,

v.

GROUP HEALTH ASSOCIATION, INC., Appellee.

No. 94–CV–1603.

District of Columbia Court of Appeals.

Argued Sept. 25, 1996

Decided March 27, 1997.

Robert A.W. Boraks, Washington, DC, for appellants.

James M. Heffler, Washington, DC, for appellee.

Before TERRY, STEADMAN, and FARRELL, Associate Judges.

TERRY, Associate Judge.

This is a medical malpractice case originally brought by James and Eunice Robinson [1] against Group Health Association ("GHA"), a corporate medical care provider. Appellants claimed that the failure of GHA to provide Mr. Robinson with aggressive treatment of his diabetes in October 1989, when he visited GHA complaining of an ulcer on his foot, resulted in the amputation of his leg below the knee in January 1990. They asserted that a proper response by GHA would have resulted in a far less debilitating treatment and would have saved Mr. Robinson's leg and most of his foot.

At trial appellants presented three witnesses: Eunice Robinson, Steven Robinson, and an expert, Dr. Alan Singer, a podiatrist.[2] GHA presented one witness, Dr. Lisa Goldberg, Mr. Robinson's treating physician. At the close of the evidence, the trial court granted a directed verdict for GHA on the ground that appellants had not presented sufficient proof of causation. The principal issue raised on appeal is the correctness of that ruling.[3] We hold that the testimony of appellants' expert, Dr. Singer, was sufficient to permit this case to go to the jury and that the trial court erred in granting a directed verdict for GHA. We therefore reverse the judgment and remand the case for a new trial.

I

The evidence at trial, viewed in the light most favorable to appellants, showed that on October 25, 1989, Mr. Robinson, a 72-year-old long-term diabetic, visited GHA with an ulcer on his foot. He also complained that his foot felt cold. The physician's assistant who examined him found that his right foot was swollen and very red, with an oozing ulceration, and was cool to the touch. Mr. Robinson was told to elevate his feet, soak them in warm water, and return for a follow-up visit in a week. When he saw another physician's assistant on November 1, Mr. Robinson's foot was purple up to his ankle, an indication that very little blood was entering that part of his body. He was also experiencing pain in his foot during the night. At that time he was given an antibiotic, advised to continue elevating and soaking his feet, and told to return in three weeks for a follow-up visit. He received the same advice during a visit on November 11, at which time it was noted that Mr. Robinson's foot looked gangrenous. On December 27 Mr. Robinson had to cancel an appointment with one of the GHA doctors because his foot was very painful and he was not able to walk. His appointment was rescheduled for about a month later.

At no time before January 1990 did the GHA doctors discuss any form of amputation or angioplasty with Mr. Robinson. When Mr. Robinson called GHA on January 10 and said he was in severe pain, he was given an appointment with Dr. Goldberg, a vascular surgeon. On January 11, at Dr. Goldberg's request, Mr. Robinson underwent an arteriogram, which revealed significant arterial disease in his legs and feet. His condition continued to deteriorate, and on January 17

1. Between the filing of the complaint and the trial, James Robinson died from causes unrelated to this case. His son Steven, the personal representative of his estate, was substituted for him as a plaintiff and carried the case forward through the trial and ultimately to this court on appeal. Eunice Robinson, James' widow, remained in the case as a plaintiff and continues in this court as an appellant.

2. In *District of Columbia v. Anderson*, 597 A.2d 1295, 1299 (D.C.1991), this court held that a

podiatrist may testify as an expert as to the standard of care "provided the witness has sufficient knowledge and experience to offer an informed judgment."

3. Appellants also contend that the trial court erred in prohibiting them from presenting a rebuttal expert witness. Because of our ruling on appellants' principal claim, and because this issue may not arise at a retrial, we need not address this argument.

he was hospitalized and his right leg was amputated below the knee.

Appellants' expert, Dr. Singer, opined that the case management of Mr. Robinson was highly ineffectual. He stated that when a diabetic comes in for treatment of extremity problems related to vascular loss, immediate steps must be taken to check the blood supply. Dr. Singer testified that there should have been a referral for vascular evaluation on October 25, the day of Mr. Robinson's initial visit. Had this been done, an angioplasty and partial foot amputation could have been performed at an early stage of his treatment. While Dr. Singer conceded that some form of amputation was probably inevitable, he said that "there was a reasonable degree of medical certainty that had one been performed after proper vascular intervention ... that [partially amputated foot] would have healed." Dr. Singer testified that "reasonable medical certainty" meant a greater than fifty percent chance. Thus, in his professional judgment, it was more likely than not that earlier surgical intervention would have significantly lessened Mr. Robinson's injuries. Dr. Singer stated that GHA's failure to manage the case in the way he described was a deviation from the standard of care and resulted in a below-the-knee amputation (BKA) that could have been averted:

> He might have lost the front part of his foot, a segment, if you will, but not necessarily his leg.... [A]s the tissue became more diseased, necrotic, and the vessels became more sclerosed and blocked, you lost more and more options of saving this man's foot, which is really what it's all about.

> \* \* \* \* \* \*

> There is a reasonable degree of medical certainty that he could have had a foot, partial foot ... amputation after an early angioplasty and pulled this off. Waiting so long doomed the fellow to a BKA.

> \* \* \* \* \* \*

> I would [say], with a reasonable degree of medical certainty ... the failure to get an early vascular consult, and the failure to have a captain of the ship amongst all these eminently qualified physicians to take this guy by the hand and really watch him, led to [the loss of his leg] with a reasonable degree of medical certainty.

Dr. Goldberg, the vascular surgeon who eventually treated Mr. Robinson in January 1990, concluded from the pre-amputation arteriogram and the post-amputation pathology report that the treatment options would have been the same in October and November of 1989 as they were in January 1990. She said that it takes years for a condition like that of Mr. Robinson to develop and that it could not have reached such severity in just a few months.

■ In moving for a directed verdict, GHA maintained that Dr. Singer's testimony failed to establish that Mr. Robinson would not have needed a below-the-knee amputation if GHA had acted properly. GHA argued, in particular, that the following testimony of Dr. Singer on cross-examination was highly speculative: ·

> He had concomitant vascular disease and he couldn't heal the sore, and, perhaps, if he had had an angioplasty from the early part on, he might have gotten a little better tissue profusion so you could have done an amputation if it was necessary, and it would have healed, instead of waiting fourteen weeks and losing his leg.

> Q. You're saying "perhaps" that could have happened?

> A. Everything in this world is perhaps.

> Q. Okay. So you're saying it's possible?

> A. Yes, sir. Everything is possible. I will concede that.

> Q. So your testimony is that if GHA had done what you say they should have, it's possible that there would have been a lower amputation rather than below knee?

> A. I would have bet on it a little bit more than I would bet if they did nothing. It was a crap shoot if they did nothing. He had an educated good chance if they did something.

The trial court relied heavily on the testimony of Dr. Goldberg when it ruled on

GHA's motion. The court said that all of the treatment options that existed in January would have been available in October or November because the nature of the disease was such that it did not develop within a three-month period. Because the court could not discern from the evidence presented that the delay resulted in the loss of Mr. Robinson's leg, as opposed to his foot or part of his foot, it ruled that proximate cause was not established and granted a directed verdict for GHA.

## II

 In reviewing an order granting a motion for a directed verdict, this court applies the same standard as the trial court and considers the evidence in the light most favorable to the non-moving party. *E.g., Pazmino v. Washington Metropolitan Area Transit Authority,* 638 A.2d 677, 678 (D.C. 1994); *Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.,* 492 A.2d 580, 586 (D.C.1985). When the evidence is viewed in this manner, a directed verdict is justified only when the evidence is so clear that reasonable persons could reach but one conclusion. "If there is room for a difference of opinion, the wise course is for the trial judge to allow the case to go to the jury." *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979) (citation omitted). "Motions for a directed verdict deprive plaintiff of a determination of the facts by a jury and should, therefore, be granted sparingly." *Id.* (citation omitted). It is only in "unusual" cases that issues of negligence and proximate cause may be taken away from the jury. *Rich v. District of Columbia,* 410 A.2d 528, 532 (D.C.1979) (citations omitted).

 To establish proximate cause in a medical malpractice case, "the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." *Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986) (citations omitted). The evidence is sufficient to establish proximate cause if the expert "state[s] an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." *Id.; see* W. PAGE KEETON, *et al.,* Prosser and Keeton on the Law of Torts § 41, at 269 (5th ed.1984) (plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact" of plaintiff's injuries). "This standard of 'reasonable' medical certainty reflects an objectively well founded conviction that the likelihood of one cause is greater than any other; it does not mean the expert is 'personally certain' of the cause ... or that the cause is discernible to a certainty." *Clifford v. United States,* 532 A.2d 628, 640 n. 10 (D.C.1987) (citation omitted).

We conclude that the testimony of Dr. Singer, as it related to the issue of proximate cause, was sufficient to allow the case to go to the jury. According to Dr. Singer, the failure of GHA to refer Mr. Robinson for vascular evaluation in October or November resulted in his below-the-knee amputation in January. Dr. Singer testified to "a reasonable degree of medical certainty," which he equated to a greater than fifty percent chance ("more likely than not," to use Prosser's words), that if there had been an early vascular consult, followed by an angioplasty and perhaps a partial foot amputation, a below-the-knee amputation could have been avoided. Although GHA presented contrary testimony from Dr. Goldberg, Dr. Singer's testimony was sufficient to permit "a reasonable juror [to] find that there was a direct and substantial causal relationship between [GHA's] breach of the standard of care and [Mr. Robinson's] injuries." *Psychiatric Institute, supra,* 509 A.2d at 624.

 Where the trial court went astray was in giving dispositive weight to Dr. Goldberg's testimony and discounting that of Dr. Singer. "In ruling on a motion for directed verdict, a trial court 'must take care to avoid weighing the evidence, passing on the credibility of witnesses, or substituting its judgment for that of the jury.'" *Jackson v. Condor Management Group, Inc.,* 587 A.2d 222, 226 (D.C.1991) (quoting *Corley v. BP Oil*

*Corp., supra,* 402 A.2d at 1263). In this case as in *Jackson,* there was expert testimony on both sides of the proximate cause issue. We reversed a directed verdict for the defendant in *Jackson* because the trial court had based its ruling on the fact that the testimony of the plaintiff's expert had been refuted by the defendant's expert. In so doing, we said, the court had "exceeded its limited role and [had drawn] conclusions based on the weight of the evidence and the credibility of witnesses." 587 A.2d at 226. We reverse here for the same reason. It was not for the court to weigh the testimony of Dr. Singer against the testimony of Dr. Goldberg; it should have left that task to the jury. *See Shannon & Luchs Co. v. Tindal,* 415 A.2d 805, 807 (D.C.1980).

The judgment is accordingly reversed, and this case is remanded for a new trial.

*Reversed and remanded.*