Jacqueline R. RANDALL, as Next Friend of Kimberly Randall, a minor, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 91–2919–OG.

United States District Court, District of Columbia.

Aug. 2, 1994.

Maurice R. Dunie, Jonathan F. Keiler, Bulman, Dunie, Burke & Feld, Bethesda, MD, for plaintiff.

Mark Nebeker, Asst. U.S. Atty., Lt. Col. Denise Vowell, U.S. Dept. of Army, Washington, DC, for defendant.

## MEMORANDUM–OPINION

GASCH, Senior District Judge.

Jacqueline Randall alleges malpractice and an absence of informed consent in the care and treatment during the pregnancy and birth of her daughter, Kimberly Randall.[1] Kimberly Randall was born on January 19, 1987, at Walter Reed Army Hospital ("Walter Reed"). Ms. Randall was treated at Walter Reed as a dependent of James Randall, her husband, who was then an active member of the United States Army. This Court has jurisdiction under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* After a bench trial on December 14–17, 1993, this Court instructed both parties to file proposed findings of fact and conclusions of law. This memorandum is issued stating the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Ms. Randall was an enlisted soldier in the Army. Trial Transcript ("Tr.") at 26. Ms. Randall became pregnant with Kimberly Randall in April, 1986. Tr. at 30. As a result of her pregnancy, Ms. Randall applied for and was granted a discharge from the Army on July 18, 1986. Tr. at 27. The discharge process for a female soldier includes a pap smear test which was administered to Ms. Randall. Tr. at 31.

2. Ms. Randall testified that she was informed by a clerk, and not medical personnel from the obstetrics-gynecology ("OB–GYN") clinic, that her pap smear had come back "positive." Tr. at 31. The pap smear results indicated Cervical Intraepithelial Neoplasia–1 ("CIN–1").[2] As a result of working on the OB–GYN ward at Walter Reed, Ms. Randall had some knowledge of the complaints made and care received by patients treated on the OB–GYN ward. Tr. at 69–70. Ms. Randall testified that she was "distraught" because she believed CIN–1 to be the first stage of cancer. Tr. at 31–32.

3. On July 31, 1986, a colposcopic examination[3] was performed to follow up the results of the pap smear. Tr. at 32. The exam was administered in the colposcopy clinic at Walter Reed. Ms. Randall stated that Dr. Purcell, the physician who performed the exam, said he saw a mole-like growth. *Id.* Ms. Randall testified she was not informed of the results of the colposcopic examination until sometime in 1987. Tr. at 33. Ms. Randall offered no testimony that she attempted to learn the results of the exam despite her distraught nature and belief that she had a pre-cancerous condition. *Id.*

4. The medical records for the July 31, 1986, colposcopic exam reflect: "Few mildly dysplastic[4] cells (CIN–1)." Joint ex. 1, at 4. Dr. Donald Levitt, expert medical witness for plaintiff, testified that there are reasons for dysplasia other than the Human Papilloma Virus ("HPV").[5]

---

1. The claims of pain and suffering and emotional distress by Ms. Randall, set forth in the original complaint, were conceded by plaintiff through counsel at a pretrial hearing. Pretrial Hearing Transcript of November 29, 1993 at 13. Counsel for the defendant raised both procedural and substantive objections to any claims of Ms. Randall. *Id.* at 7–8, 13. The caption of the case is redacted by the Court to reflect that Kimberly Randall, through her mother as next friend, is the sole plaintiff remaining in the case.

2. Cervical Intraepithelial Neoplasia (CIN–1): "dysplastic changes beginning at the squamocolumnar junction in uterine cervix which may be precursors of squamous cell carcinoma: grade 1, mild dysplasia involving the lower one-third or

less of the epithelial thickness." Stedman's Medical Dictionary, 1029 (William R. Hensyl ed.) (Williams & Wilkins, 25th ed. 1990).

3. Colposcopic Examination (Colposcopy): examination of female genitalia and cervix cells *in vivo* under magnification using an endoscope which allows direct observation and study of these tissues. Stedman's Medical Dictionary at 331.

4. Dysplasia: "abnormal tissue development." Stedman's Medical Dictionary at 478.

5. Human Papilloma Virus (HPV): a virus which causes infectious papilloma in humans which causes cutaneous and genital warts. Exists in

5. On October 3, 1986, a second colposcopic exam was performed. Tr. at 34. Ms. Randall testified that the attending physician said: "Well, it's not a mole" and completed the exam. *Id.* Ms. Randall also testified that she did not ask the doctor anything about the growth. *Id.* Ms. Randall stated that she did not learn of the results of this exam until 1987 after the birth of Kimberly. *Id.* The colposcopic results notes: "Marked inflammation present with a few koilocyctes [6] suggestive of condyloma.[7]" Joint ex. 1, at 11. Condyloma Acuminatum, commonly known as genital warts, is a subtype of HPV and is a sexually transmitted disease. Tr. at 358.

6. Dr. Cheryl Conetsco performed the October 3rd colposcopic exam of Ms. Randall. Tr. at 497. Dr. Conetsco testified that she observed white epithelium on Ms. Randall's cervix which was noted in the medical records. Joint ex. 1, at 10. Tr. at 498. Dr. Conetsco stated that the white epithelium could represent "low grade dysplasia, it may represent HPV, it may represent immature metaplasia." Tr. at 498.

7. Dr. Conetsco asserted that the reason a biopsy was not performed on the cervix was because Ms. Randall was pregnant. Tr. at 499. Dr. Conetsco testified that she would have noted any condyloma or any growths appearing on a patient's genitalia. Tr. at 500. Ms. Randall testified that near the time of the October colposcopic exam, small pink growths or bumps began to appear on her genitalia. Tr. at 36.

8. In the colposcopy clinic at Walter Reed, a group of doctors review the results of colposcopic exams and recommend treatment. Tr. at 472–73, 501–02. Dr. Philippe Girerd testified that the recommended treatment of the physicians who reviewed the results of Ms. Randall's second colposcopy was to return three months postpartum for a follow-up exam. Joint ex. 1, at 10. Tr. at 473. Dr. Girerd stated that the reasoning for the recommendation was that the low grade CIN–1 did not appear as if it was about to become cancerous. Tr. at 473. Dr. Girerd asserted that this treatment was standard medical practice. Tr. at 474. Dr. Levitt admitted that koilocytes can be caused by things other than condyloma. Tr. at 289.

9. Ms. Randall testified that while pregnant with Kimberly she was seen by several different interns and residents during her visits to the OB clinic at Walter Reed. Tr. at 35. Ms. Randall did not have a regular OB physician. *Id.* At the Walter Reed OB clinic, patients were attended to by the doctor who was on duty at the date and time of their visits. Tr. at 34–35. Most of the prenatal visits were "tummy checks" which did not include a full exam of the genital area.

10. Ms. Randall said that her routine OB visits included only two vaginal exams; one at six months and another during the last trimester. Tr. at 35–36. These vaginal OB exams are distinct from the two colposcopic exams which were administered in the GYN clinic. The GYN and OB clinics at Walter Reed are physically separate and keep separate records. Tr. at 342–45.

11. In October 1986, Ms. Randall asserts that small pink stems or growths began to appear on her genital area. Tr. at 36. Ms. Randall testified that these growths were irritated from friction with her underwear and caused pain during intercourse. Tr. at 37. Ms. Randall stated that in late October, "one very large" growth started coming out of her vagina causing her to end sexual inter-

many forms called "types." Stedman's Medical Dictionary at 1720. Types 6 and 11 have been associated with Juvenile Laryngeal Papillomatosis or Recurrent Respiratory Papillomatosis in children born to mothers with HPV. Tr. at 381–382.

**6.** Koilocyte: "a squamous cell, often binucleated, showing a perinuclear hole; characteristic of condyloma acuminatum." Stedman's Medical Dictionary at 829. Dr. Haskins Kashima testified that "[k]oilocyte is simply a descriptive term meaning that there is an empty spot." Tr. at

370. Dr. Kashima explained koilocytes are found in condyloma, certain cancers and papilloma. *Id.*

**7.** Condyloma Acuminatum: "a projecting warty growth on the external genitals or at the anus, consisting of fibrous overgrowths covered by thickened epithelium showing koilocytosis, due to infection by human papilloma virus; it is almost always benign, although malignant change has been reported." Stedman's Medical Dictionary at 340.

course with her husband because of the pain. *Id.*

12. After complaining to Dorothy Jarry, her grandmother and a retired practical nurse, Ms. Randall testified that she was examined by her grandmother in late October. Tr. at 38–40, 75. Mrs. Jarry testified that in the middle of October she examined her granddaughter's vagina and saw several raised places which formed a cluster. Tr. at 307–308. Mrs. Jarry stated that she was concerned for the baby because these areas appeared malignant. Tr. at 308–09. Mrs. Jarry also testified that her granddaughter informed the Army doctors of these growths. Tr. at 309.

13. Mr. James Randall, Kimberly's father, testified that the warts appeared on Ms. Randall in early October, 1986. Tr. at 168. Mr. Randall also stated that Ms. Randall complained of pain during intercourse. Tr. at 170–71. Mr. Randall stated that he continued to have sexual relations with Ms. Randall despite the presence of dime-size warts on Ms. Randall's vagina and entire genital region. Tr. at 171–72. The examination of Ms. Randall by her grandmother is corroborated by Mr. Randall's testimony. Tr. at 173. Mr. Randall is separated but not divorced from Ms. Randall. Tr. at 166. The Court finds Mr. Randall's testimony less than completely credible.[8]

14. In late October, Ms. Randall contends that she informed Dr. Brian O'Connor about these growths.[9] Tr. at 38. Ms. Randall asserts that Dr. O'Connor said that she should be seen in the colposcopy clinic and that Ms. Randall responded that she was not supposed to go back until after the birth of her child. *Id.* Ms. Randall testified that Dr. O'Connor said: "Well just do what they tell you." *Id.*

15. Ms. Randall's obstetrical records show that Dr. O'Connor saw Ms. Randall for a routine obstetrical visit on November 10, 1986. Joint ex. 1, at 12. Dr. O'Connor performed a "tummy check" which does not include an examination of the genital area. Tr. at 525. Dr. O'Connor replied that if Ms. Randall had complained of wart-like growths, he would have examined her and noted this exam on the OB records. Tr. at 525.

16. Dr. O'Connor admitted, on being questioned by Ms. Randall's counsel, that he had no personal memory of any statements Ms. Randall may have made but he also repeated that he would have noted any complaints in the medical records. Tr. at 553. Dr. O'Connor denied that he would have instructed a patient "to do whatever the colpo clinic told her" if a patient were complaining of genital growths. Tr. at 526. Dr. O'Connor testified that he could recognize, diagnose and treat condyloma. Tr. at 538. Dr. O'Connor treated Ms. Randall in the GYN clinic for condyloma with podophyllin on July 22, July 29 and August 5, 1987. Joint ex. 1, at 101–03. Tr. at 539–40.

17. Dr. Harry Collins testified that he attended Ms. Randall on November 24, 1986, for an obstetrical visit. Tr. at 518. This visit did not include an examination of the genital area. Tr. at 519. The medical record of the visit states "all well" and reflects no evidence of condyloma. Joint ex. 1, at 15. Dr. Collins contends that he would have examined Ms. Randall if she were complaining of lesions in her vagina. Tr. at 520.

18. Ms. Randall had another obstetrical visit in the clinic on December 29, 1986. Tr. at 324. Dr. Timothy Puckett was the attending doctor who performed a "tummy check." Tr. at 331. Dr. Puckett's medical notations of this visit show no indication of genital

---

8. Mr. Randall's separation from the Army was introduced by the government to question the credibility of the witness. Defendant produced documentation to show Mr. Randall was discharged from the Army for misconduct in the commission of a serious offense. Tr. at 181. Mr. Randall failed to pay debts of $644.95, $1,100.45, $67.17, $128.48 and 1,410 deutschemarks. Tr. at 182. Mr. Randall stated he did not contest the dismissal because he was tired of arguing with the Army. Tr. at 183.

9. Dr. O'Connor had attended to Ms. Randall before this visit. In the summer of 1985, Ms. Randall was admitted to Walter Reed for complications arising out of an incomplete abortion performed at a private clinic. Tr. at 29. Dr. O'Connor performed a dilation and curettage ("D and C") on Ms. Randall. *Id.*

condyloma or Ms. Randall's alleged complaints. Joint ex. 1, at 5, 16.

19. Ms. Randall experienced a false labor on December 31, 1986. Tr. at 40. Ms. Randall again was attended by Dr. Puckett. Tr. at 321. Dr. Puckett was resident in OB–GYN at Walter Reed when Ms. Randall presented for false labor. *Id.* Ms. Randall contends she was asked by Dr. Puckett, who appeared to be a young doctor, what these "bumps" were. Tr. at 40. Dr. Puckett directly refuted asking such a question. Tr. at 335–36. Dr. Puckett testified that he was able to diagnose condyloma. Tr. at 336. Dr. Puckett said that he had treated "a lot" of sailors with genital condyloma during his fourth year dermatology rotation at Portsmouth Naval Hospital. Tr. at 322. Dr. Puckett also subsequently treated Ms. Randall for condyloma in 1987 and 1988. Tr. at 332–35. Joint ex. 1, at 108–10.

20. Dr. Puckett testified that he would have ordered a syphilis test if growths appearing to be condyloma were present to ensure they were not secondary syphilis. Tr. at 326, 336. On December 31, Dr. Puckett conducted both the genital and the cervical exams of Ms. Randall. Tr. at 330. Dr. Puckett asserted that he would have noted the appearance of condyloma on the genital area if it were present. Tr. at 325. The medical records of this visit do not indicate condyloma. Joint ex. 1, at 18, 19.

21. On January 1, 1987, Ms. Randall arrived at Kimbrough Army Community Hospital complaining of labor pains. Joint ex. 1, at 20–21. Ms. Randall was attended by Dr. Gary English. *Id.* The medical records of this visit do not record the presence of vulvar condyloma. Joint ex. 1, at 20–23.

22. On January 16, 1987, Ms. Randall was seen by Dr. O'Connor in the OB clinic. Joint ex. 1, at 40–41. This visit included a vaginal exam. Tr. at 535. Dr. O'Connor testified that if Ms. Randall had complained of, or if he had observed genital condyloma, he would have noted condyloma in Ms. Randall's obstetrics record. *Id.*

23. Ms. Randall went into labor on January 18, 1987. Tr. at 90. Ms. Randall was in labor for one and one-half days before Pitocin was administered to facilitate delivery. Tr. at 42. Ms. Randall testified that she received a vaginal exam about every two hours. Tr. at 90. Joint ex. 1, at 69. Dr. Deborah LeBeau testified that Ms. Randall received nine vaginal exams according to the record. Tr. at 440. Joint ex. 1, at 69. Drs. Puckett, LeBeau and Girerd performed vaginal and cervical exams on Ms. Randall. Tr. at 332, 430, 474. Dr. John Procter performed a vaginal exam of Ms. Randall at 8:00 p.m. on the evening of the 18th. Joint ex. 1, at 69. Dr. Procter testified that the practice at Walter Reed would be to "chart" condyloma if seen because of the possible relationship between HPV and cervical cancer. Tr. at 455.[10]

24. An episiotomy was performed on Ms. Randall. Tr. at 44. Dr. LeBeau testified that she, as the intern, probably made the incision for the episiotomy and stitched up the episiotomy after the birth. Tr. at 435–36. Ms. Randall recalled that the episiotomy was checked several times by the nurses and once by a doctor. Tr. at 90. Dr. Lebeau stated that women who have had an episiotomy were routinely checked on a daily basis for evidence of infection, swelling, or separation of the area. Tr. at 441. The medical records reflect no complications with the execution, repair, or healing of the episiotomy site. Joint ex. 1, at 70–71.

25. Ms. Randall stated she was examined by her grandmother after returning home from the hospital. Tr. at 45. Ms. Randall asserted that Mrs. Jarry was concerned that the doctor had cut through the warts when performing the episiotomy. *Id.*

26. On March 3, 1987, Ms. Randall went to the emergency room at Walter Reed complaining of pain and irritation from the warts where she was attended to by Dr. Joseph Zeligs. Tr. at 91. Joint ex. 1, at 74. Dr. Zeligs' medical notes of this visit state: "One week postpartum noted development of wart like bumps in the vicinity of episiotomy stitches which have increased over past five

10. Dr. Procter subsequently diagnosed and treated plaintiff for condyloma based on an exam of the vulva at eight weeks postpartum on March 13, 1987. Tr. at 458. Joint ex. 1, at 80–81.

weeks." Tr. at 133. Joint ex. 1, at 74. Dr. Zeligs testified that the note is in his handwriting and that the information was obtained from the patient. Tr. at 134.

27. Despite the presence of condyloma on Ms. Randall, Dr. Zeligs notes a normal vaginal exam. Joint ex. 1, at 74. Dr. Zeligs testified that the presence of condyloma and a report of a normal vaginal exam is not unusual. Tr. at 143. Dr. O'Connor agreed with this statement of Dr. Zeligs but added that he was performing a different exam for a different reason. Tr. at 554. Dr. Zeligs attended Ms. Randall in the emergency room for pain associated with the warts. Joint ex. 1, at 74. Dr. O'Connor attended to Ms. Randall for specific purposes when she presented in either the OB or GYN clinic in 1986 and 1987. *Id.*

28. The next day, Ms. Randall was seen in the colposcopy clinic by Dr. Maryanne Bombaugh. Joint ex. 1, at 76–77. Ms. Randall testified that Dr. Bombaugh said it was one of the worst cases of condyloma Dr. Bombaugh had ever seen and that Ms. Randall would need surgery. Tr. at 47.

29. The medical records of this visit state: "A 20–year–old white female presents for biopsy and evaluation of vulvar condyloma present since birth of her child." Tr. at 567. Dr. Bombaugh interpreted her note to mean that the condyloma appeared after the birth of the child. Tr. at 567. This information, recorded by Dr. Bombaugh, was given to her by Ms. Randall.[11] Tr. at 576.

30. Dr. Bombaugh has no personal recollection of exactly what Ms. Randall had said but stated that was the precise reason for making a record. Tr. at 577. Dr. Bombaugh's notes also indicate: "pt: has h/o of condyloma of cvx & dysplasia since May '86 & is presently followed in colpo clinic." Joint ex. 1, at 77. Tr. at 142. Dr. Bombaugh testified that this note reflects three statements: 1) The patient had a history of condyloma of the cervix, 2) Dysplasia since May of 1986, and 3) She presently is followed in the colposcopy clinic. Tr. at 578. Dr. Bombaugh stated that the note should not be read to say that Ms. Randall had a history of

condyloma since May of 1986, only a history of dysplasia since that date.

31. In March 1987, a third colposcopic exam was performed and surgery was scheduled to remove the warts. Ms. Randall testified that at this exam she learned for the first time the results of the two previous colposcopic exams. Tr. at 48. Ms. Randall testified that Dr. Hall told her that the results of the first and second exams were "consistent with what was going on now." Tr. at 48.

32. The Court finds that the physicians at Walter Reed knew or should have known that Ms. Randall suffered from HPV which manifested itself as genital warts in January of 1987 at the time of Kimberly Randall's birth. The June pap smear and the October 3 colposcopic exam both indicated objective symptoms of condyloma. By March 3, 1987, eight weeks after the birth of Kimberly Randall, Ms. Randall was being treated at Walter Reed for extensive condyloma. Joint ex. 1, at 76–77.

33. The Court recognized Dr. Haskins Kashima as an expert in otolaryngology. Tr. at 355. Dr. Kashima has treated Kimberly Randall since December of 1989. Tr. at 60. Dr. Kashima testified that Kimberly Randall suffered from what is referred to as Juvenile Onset Recurrent Respiratory Papillomatosis or Juvenile Laryngeal Papillomatosis ("JLP"). Tr. at 356.

34. Dr. Kashima stated that papillomatosis is a term meaning wart. *Id.* Dr. Kashima explained that JLP manifests itself in warty growths in the respiratory tract of juveniles from the nose down to the lungs but is most often found on the larynx. *Id.* The JLP in Kimberly Randall is caused by the 6–C subtype of the Human Papilloma Virus. Tr. at 364. The number 6 subtype of HPV is associated with genital warts. *Id.* JLP has an estimated mortality rate of five percent. Tr. at 357. These deaths occur when recurrent papillomas obstruct the airway and cause suffocation. *Id.*

---

**11.** Dr. Bombaugh testified that plaintiff also told the doctor that the abortion Ms. Randall had in 1985 was spontaneous and not an elective abortion. Joint ex. 1, at 6. Tr. at 564.

35. The Court credits Dr. Kashima's opinion within a reasonable degree of medical certainty "that Kimberly was infected during the childbirth in the birth canal." Tr. at 365. The Court credits Dr. Kashima's testimony that had a Caesarean section been performed, Kimberly Randall would not suffer from JLP. Tr. at 365.

36. The testimony of the expert witnesses is in disagreement as to whether an obstetrical standard of care existed in the treatment of a pregnant woman with genital HPV in January 1987. The Court finds all the expert witnesses are highly qualified to give an expert opinion. Their division over the question of an obstetrical standard of care when Kimberly Randall was born in January 1987 is reflective of a dispute over JLP in the medical community which lingers to this day. Tr. at 382–83.

37. Dr. Gerald D. Willet was accepted by the Court as an expert witness in OB–GYN and pathology. Tr. at 594. Dr. Willet testified that a Caesarean section is not indicated unless there was an obstruction of the birth canal or an increased concern about bleeding and infection. Tr. at 618.

38. Dr. Bruce Patsner was accepted by the Court as an expert in the field of obstetrics with a specialty in gynecological oncology. Tr. at 652. Dr. Patsner stated that "there was no accepted standard way to counsel a patient with HPV during pregnancy at that point in time." Tr. at 655–65. Dr. Patsner confirmed Dr. Willet's opinion that a Caesarean birth was indicated only when there was obstruction of the birth canal or pain and bleeding would result from a vaginal birth. Tr. at 661, 672.

39. Dr. Donald Levitt was accepted by the Court as an expert in OB–GYN. Tr. at 255. Dr. Levitt testified that, in his opinion as an expert, he would have given Ms. Randall more information about her condition and options as to delivery. Tr. at 276–77. Dr. Levitt stated that a patient should "be informed of the possibilities, whether or not obstruction existed, whether or not there's a possibility of hemorrhage, or whether or not the child could be inoculated with the virus as it passed through the birth canal,

and obviously give her options as to the mode of delivery." Tr. at 277.

40. Dr. Grumbine was accepted as an expert in OB–GYN. Tr. at 147–49. Dr. Grumbine asserted that, in his expert opinion, the patient should have been notified of the risks to herself and the unborn child when the pregnant mother has genital HPV. Tr. at 157.

41. The Court accepts the testimony of Ms. Randall that if she had known of the risk of JLP associated with vaginal delivery and HPV lesions, then she would have delivered Kimberly Randall by Caesarean section. Tr. at 88.

42. Megan Randall, Ms. Randall's second child, was born at a private hospital in May, 1988. Tr. at 54. Megan Randall does not suffer from JLP. Tr. at 54. Prior to the birth of Megan Randall, on December 3, 1987, the warts on Ms. Randall's vaginal area were treated by laser ablation. Tr. at 54. Dr. Grumbine, a private physician, performed the operation. Tr. at 154. Dr. Grumbine admits that the laser treatment would not eliminate the virus completely but it would reduce the risk of JLP. Tr. at 152.

43. Laser surgery is used to clear the warty obstructions from Kimberly Randall's throat. Tr. at 367. Dr. Kashima stated that the papillomas, or warts, tend to regrow from the moment they have been removed. Tr. at 368. The average operation, under general anesthesia, requires between one and a half to two hours. Tr. at 367. As of the date of the bench trial, Kimberly Randall had undergone 25 procedures. Tr. at 368. Dr. Kashima said that, when a person with JLP reaches puberty, the growth of the airway reduces the risk of obstruction due to the papillomas. Tr. at 376. The papillomas are still present, however, and can cause residual hoarseness. *Id.*

44. The Court finds that reasonable medical costs in the amount of $78,720.63 have been incurred. Pl. ex. 1. The Court finds that $24,000 in foreseeable medical expenses will be incurred this year, and for the next seven years. Tr. at 376–77. Pl. ex. 1. Plaintiff's Findings of Fact and Conclusions

of Law at 31–32, ¶ 71 (eight years at $24,000 per annum for a total of $192,000).

45. The Court finds that damages for the pain and suffering of Kimberly Randall is appropriate in the amount of $500,000.

## CONCLUSIONS OF LAW

### A. Medical Malpractice

■ In the parties' conclusions of law, both sides rely on relatively the same case law and do not contest the legal standards which are applicable. The U.S. Court of Appeals for the District of Columbia Circuit has stated that in order to meet the burden of proof, "[the] plaintiff must affirmatively prove the relevant recognized standard of care exercised by other physicians and that defendant departed from that standard when treating the plaintiff." *Robbins v. Footer*, 553 F.2d 123, 126 (D.C.Cir.1977). The applicable test of Ms. Randall's medical malpractice claim is whether Walter Reed violated the national standard of care in the treatment of Kimberly Randall. In *Morrison v. MacNamara*, a Superior Court judge instructed the jury that a local standard of care was to be applied. 407 A.2d 555 (D.C.1979). The District of Columbia Court of Appeals reversed, holding that a national standard applies. In its opinion, the Court laid out the legal test for medical malpractice of 1) standard of care, 2) breach of that standard, and 3) causation. *Id.* at 560. See also *Kosberg v. Washington Hospital Center*, 394 F.2d 947, 949 (D.C.Cir.1968). The D.C. Court of Appeals held that standard of care to be "that degree of reasonable care and skill expected of members of the medical profession under the same or similar circumstances." *Id.* at 564, citing *Robbins v. Footer*. The Court went on to hold that a national standard of care applied in the District of Columbia. A local standard of care, the Court reasoned, is an outmoded concept designed to protect rural physicians from being measured against their urban brethren in the days when transportation and communication did not allow for the easy flow of knowledge. *Id.* at 562. Even if this were still true, this reasoning is not applicable to a major metropolitan area such as the District of Columbia. *Id.*

In *Psychiatric Institute of Washington v. Allen*, the D.C. Court of Appeals provides insight concerning the element of causation. 509 A.2d 619 (D.C.1986). The Court begins its opinion with a recitation of the elements for medical malpractice—standard of care, breach, causation and injury. *Id.* at 623–24. To establish proximate cause, the Court writes: "[T]he plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between defendant's breach of the standard of care and plaintiff's injuries *and* that the injuries were foreseeable." *Id.* at 624. This relationship is proven or disproved by expert testimony. *Id.*

■ The law does not require, however, that the expert testify that he is personally certain that the plaintiff would not have sustained the injuries but for defendant's negligence. *Id.* The law of causation is incapable of mathematical certitude. No one can say with mathematical certainty what would have occurred if the defendant had acted differently. The expert need only state an opinion, based on a reasonable degree of medical certainty, that defendant's negligence is more likely than anything else to have been the cause, or a cause, of plaintiff's injuries. *Id.* at 624.

■ This analysis leaves room for situations where it is impossible to tell if the injury would have occurred regardless of defendant's actions. However, it still requires that there be some degree of certitude that defendant's actions at least contributed to the plaintiff's injuries. The plaintiff has proved the element of causation. The Court found credible Dr. Kashima's testimony that the cause of JLP in Kimberly Randall was her birth through the infected birth canal of Ms. Randall. Dr. Kashima was the only otolaryngologist to testify. Dr. Kashima treats patients with JLP and has written several articles on the nature and treatment of recurrent respiratory papillomatosis. Tr. at 354. Pl. ex. 7. In Dr. Kashima's opinion as a medical expert, the fact that defendant did not perform a Caesarean section in the birth of Kimberly Randall caused JLP in the plaintiff.

■ Plaintiff, however, has not met her burden of proof in showing that there existed, at the time, a national obstetrical standard of care requiring a Caesarean delivery to be performed. The dispute among the expert witnesses centers on whether in January, 1987, there existed a medical standard that a Caesarean section would reduce the risk of a child contracting JLP where the mother has genital HPV. Two of the experts, Drs. Patsner and Willet, testified that a Caesarean delivery would be offered only in the case of HPV lesions obstructing the birth canal or where there existed a risk of increased bleeding or infection. Drs. Grumbine and Levitt testified that they would make the patient aware of all the risks and offer options as to the mode of delivery. The testimony of Drs. Grumbine and Levitt, however, goes to the issue of informed consent and does not establish a standard of care in a medical malpractice claim that a Caesarean section should have been performed. Dr. Levitt in his testimony refers to Caesarean birth in terms of an option, not a required medical course of treatment. Tr. at 277. Dr. Grumbine testified that the treatment of the HPV lesions with laser ablation would only reduce the risk of JLP and would not eliminate completely the virus. Tr. at 152. Because of the possibility of the virus still being present, Dr. Grumbine testified that the patient should be informed of the options as to the delivery method. Tr. at 157.

## B. *Informed Consent*

■ The D.C.Circuit held that the test for determining whether a particular peril must be divulged is "its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked." *Canterbury v. Spence*, 464 F.2d 772, *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (D.C.Cir. 1972). Materiality has been defined as "[w]hen a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forgo the proposed therapy." [sic] *Id.*, at 786–787. The courts have carved out some legal exceptions to the disclosure rule. They, however, do not apply in this case.

In the present case, several questions arise in light of *Canterbury*. Should the results of the June pap smear showing irregular cells have been disclosed to Ms. Randall? The *Canterbury* case answers: Yes—"[d]ue care may require a physician perceiving symptoms of a bodily abnormality to alert the patient to the condition." *Id.*, at 781. 1) Should Ms. Randall then have been counseled to consider a Caesarean versus a vaginal birth? 2) If yes, what would a reasonable person have decided? 3) Would it have made a difference if the child had been born via Caesarean section?

■ The Court finds that Walter Reed knew or should have known that Ms. Randall had HPV at the time of Kimberly Randall's birth. The June pap smear and the October 3rd colposcopic exam provide objective evidence of the onset and progression of condyloma. Joint ex. 1, at 4, 11. At eight weeks post partum, Ms. Randall was compelled to visit the emergency room at Walter Reed for relief from the pain and discomfort associated with extensive condyloma. Joint ex. 1, at 74. The Court, in addressing the claim of a lack of informed consent, is investigating whether Walter Reed should have acted on the information in its own possession in the form of Ms. Randall's GYN records. *Hitchcock v. United States*, 665 F.2d 354, 361 (D.C.Cir.1981). The root cause of Walter Reed's difficulty in recording and disseminating Ms. Randall's condition to the several doctors attending her was the fact that the OB and GYN clinics had separate facilities and kept separate records. The physicians in the OB clinic did not have ready access to the colposcopy records, located in the GYN clinic, indicating the development of HPV in Ms. Randall. Tr. at 342–45.

In *Henderson v. Milobsky*, the D.C.Circuit largely reiterated its opinion in *Canterbury*. 595 F.2d 654 (D.C.Cir.1978). It emphasized the portions of the *Canterbury* decision which concluded that "the obligation to inform the patient of appreciable risks depends in large part on the need for the treatment, the likelihood that injury will occur, and the seriousness of any injury that could follow." *Henderson*, 595 F.2d at 659. Drs. Grumbine

and Levitt testified that there was an obligation to acquaint Ms. Randall with all the risks associated with each mode of delivery and to provide options. Dr. Kashima, although not an obstetrician, stated that a Caesarean section should have been performed to prevent the risk of JLP. Tr. at 365. Dr. Kashima treats patients with JLP and knows the risk and causation associated with HPV and JLP better than any of the other expert witnesses who testified. Even the defendant's expert witness, Dr. Bruce Patsner, concedes that the connection between HPV and JLP was being reported in the medical literature in 1986. Tr. at 655. Dr. Patsner goes on to say that "there was no accepted standard for the way to counsel a patient with HPV at that point in time." *Id.* The absence of a standard method of treatment or procedure, however, does not relieve Walter Reed of an obligation to counsel Ms. Randall of the possible risks associated with HPV. While the Court determined that the plaintiff had not met her burden of proof as to whether a medical standard of obstetrical care existed in January 1987 in treating a pregnant woman with HPV, the Court does conclude that plaintiff has shown an obligation on behalf of Walter Reed to inform Ms. Randall as to the risks associated with a vaginal delivery.

With informed consent cases, causation occurs when the disclosure of significant risks, incidental to treatment, would have resulted in a decision against the proposed approach. This is an objective standard determined "in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance." *Canterbury,* 464 F.2d at 790–791. Dr. Kashima stated that, in his opinion as an expert witness, had a Caesarean section been performed, Kimberly Randall would not suffer from JLP. Tr. at 365. The Court heard testimony as to the nature and severity of JLP from Dr. Kashima. The Court learned that Kimberly Randall, only age seven, already has undergone 25 procedures to relieve the symptoms of JLP. A reasonable prudent person, in Ms. Randall's position, having been made aware of the risk and severity of JLP in an infant, would have decided in favor of Caesarean delivery. The Court also accepts Ms. Randall's testimony that she would have had a Caesarean section had she known of the risk of JLP to her child.

**C. Damages**

The Court awards reasonable medical costs in the amount of $78,720.63 which have been incurred. Pl. ex. 1. Recovery for future consequences is allowed in the District of Columbia if it is "reasonably certain" they will be incurred. *Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111, 119 (D.C.Cir.1982). The Court of Appeals had defined "reasonably certain" as "requir[ing] plaintiffs to prove that it is more likely than not (a greater than 50% chance) that the projected consequence will occur." *Id.* Recovery of speculative damages for future consequences is not permitted. *Id.* Dr. Kashima testified that Kimberly Randall will require continued treatment to remove the lesions in her throat at least until early adolescence. Tr. at 375. After a person with JLP reaches puberty, the need for continued procedures diminishes. Dr. Kashima asserted that there could be several explanations for a reduction in the need for treatments. Dr. Kashima stated that the growth of the airway when a patient reaches puberty reduces the risk of blockage of the passage by the lesions. Tr. at 376. Dr. Kashima also added that teenage patients appear unwilling to continue treatment when the need and benefits of the procedure does not appear to outweigh the discomfort. *Id.* Kimberly Randall is seven years old. The Court finds that $24,000 in foreseeable medical expenses will be incurred this year, and for the next seven years. Pl. ex. 1.; Plaintiff's Findings of Fact and Conclusions of Law at 31–32, ¶ 71; Tr. at 376–377 (Eight years at $24,000 *per annum* for a total of $192,000). While Dr. Kashima testified that JLP is an incurable disease, Dr. Kashima stated that Kimberly Randall might suffer from continued hoarseness and require more procedures but noted that it is "difficult to predict." Tr. at 376–77. Any damages for medical expenses after Kimberly Randall reaches the age of fourteen would be speculative in nature. *Wilson,* 684 F.2d at 119.

■ The Court finds that damages for the pain and suffering of Kimberly Randall are appropriate in the amount of $500,000. The procedure to treat the growths in Kimberly Randall's throat is an operation which requires general anesthesia. Tr. at 367. The laser surgery is performed through the oral cavity to remove the growths on the larynx. *Id.* The rate of Kimberly Randall's surgeries is every two months. Tr. at 370. JLP is an incurable disease despite the reduced risk of obstruction after the patient reaches puberty. Tr. at 372.

### ORDER

Wherefore, upon the evidence adduced at trial, the proposed findings of fact and conclusions of law submitted by the parties' counsel, and the entire record herein, and for the reasons set forth in the accompanying Memorandum–Opinion of this same date, it is by the Court this 2nd day of August, 1994,

ORDERED that judgment be, and hereby is, entered for the plaintiff, Kimberly Randall; and it is further

ORDERED that the defendant tender to the plaintiff the sum of $770,720.63 in compensatory damages; and it is further

ORDERED that the award, after the payment of legal fees associated with this trial and the $78,720.63 for medical expenses already incurred, be, and hereby is, held in trust for the medical expenses of Kimberly Randall until she reaches the age of twenty-one years when the remainder of the trust shall be relinquished to Kimberly Randall; and it is further

ORDERED that J. Gordon Forester, Esq. of Greenstein, DeLorme & Luchs, 1620 L Street N.W., Suite 900, Washington, D.C. 20036 be, and hereby is, appointed as trustee of the trust.